IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARJORIE BURGESS,

      Plaintiff,

v.

OFFICER TERRY LILES, *et al.*,

      Defendants.

No. C 08-4029 SI

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment is scheduled for a hearing on January 14, 2011. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument and VACATES the hearing. For the reasons set forth below, the Court GRANTS the motion.

**BACKGROUND**

This case arises out of the shooting and killing of seventeen-year old Christopher Burgess ("Burgess" or "decedent") by defendant Officer Terry Liles on October 23, 2006. On October 23, 2006, at approximately 1:30 p.m., defendant Officer Fennell, employed by the Humboldt County Probation Department, received a telephone call from an anonymous caller who asked whether Christopher Burgess had cleared an outstanding warrant as Burgess had represented. Fennell Decl. Ex. A at 1 (Incident Report). Fennell informed the caller that she could not provide information about Burgess' legal status. *Id*. The caller told Fennell that Burgess was at a residence in Eureka, California, and provided the address to Fennell. *Id*. As there was in fact an outstanding warrant on Burgess, Fennell assembled two other probation officers, defendants McLaughlin and Schaening, to join her to arrest

Burgess. *Id.*

Upon the officers' arrival at the residence identified by the caller, they encountered an adult female walking outside the gate. *Id.* The woman stated that Burgess was at "my" residence, and she directed the officers to the structure on the premises where Burgess was located. McLaughlin Decl. Ex. A at 1. The woman gave permission to the officers to enter to arrest Burgess. *Id.*

When the officers entered the residence they saw Burgess, who was armed with a knife. Fennell Decl. Ex. A at 2; Schaening Decl. Ex. A at 2; McLaughlin Decl. Ex. A at 2. The officers repeatedly told Burgess to drop the knife. *Id.* Burgess refused to do so and yelled obscenities at the officers and threatened them with slashing motions with the knife. *Id.* Burgess continued to threaten the officers, and Schaening twice deployed pepper spray on Burgess. *Id.* Burgess then fled out of the residence, and the officers pursued him on foot and contacted the Eureka Police Department for backup. *Id.*

Burgess, still holding the knife, ran in the direction of a Eureka elementary school. McLaughlin Decl. Ex. A at 2. A witness, Darin Stevens, testified that he saw Burgess holding the knife and running down the street by the school. Delaney Decl. Ex. A (Stevens Depo. at 15:3-16:21). Stevens testified that he yelled at Burgess three or four times to drop the knife. *Id.* at 15:14-15. Another witness, Jon Sylvia, who is an off-duty Humboldt County Officer (and not a defendant in this case), was picking up his child from the elementary school and saw a "man" run by with a knife. Sylvia Decl. Ex. A at 10-12. Burgess ran past the school and into a wooded residential area.

Defendant Eureka Police Department Officer Liles responded to the call for backup, and arrived in his police unit at the scene of the foot pursuit. Liles saw the probation officers in the street waving at him and pointing towards a brushy area. Galipo Decl. Ex. D (Liles Depo. at 16:20-23). Liles parked his vehicle and spoke to the probation officers, who told him that they had lost sight of Burgess but that Burgess might have been diverted into the residential area to the officers' right side. McLaughlin Decl. Ex. A at 3. Liles began to search for Burgess, and he encountered Schaening, who was also searching for Burgess. Galipo Decl. Ex. D (Liles Depo. at 22:3-10). Schaening informed Liles that Burgess had a knife, *id.*, and that he believed Burgess was located in a gulch. Liles Decl. Ex. A at 16. Liles, who was standing on a ridge, called out in the direction of the gulch and stated that a K-9 dog would soon be there and that Burgess should surrender. *Id.* at 17. Liles then saw and/or heard a movement in the

2

vegetation at the bottom of the gulch, and Liles ran down into the gulch. *Id.* Because Liles knew Burgess had a knife, Liles had his duty weapon drawn. *Id.* at 21-22. Liles pursued Burgess, identified himself as a police officer, and caught sight of Burgess and saw that he was holding a knife. *Id.* Liles continued to chase Burgess, and temporarily lost sight of him when Burgess disappeared behind some sort of obstacle. *Id.* at 17. Liles caught up to Burgess on a muddy hillside with dense vegetation, which he described as "pretty much all around me except for right in front of me . . . where, uh, the suspect was." *Id.*

At his deposition, Officer Liles testified about the events that happened next:

Q: When you were able to see Chris Burgess next after this one- to three-second time frame in which he – he fell out [of] your sight, at that moment when you first caught sight of him again, were you standing or moving?

A: When I first caught sight of him, I saw that he had turned and was facing me and so I stopped and was facing him.

Q: And what was the distance between you and Chris Burgess at that moment?

A: Probably about five feet.

Q: And was there any exchange of words between you and – and/or Chris Burgess at that moment?

A: I told him to drop the knife several times.

Q: And – what did Chris Burgess do then, after that, after you told him to drop the knife?

A: Well, I had my department issued-Glock sidearm out. I was pointing it at him. I told him three times to drop the knife and he stated something to the effect of "I don't want to go back."

Q: And did he then turn around and continue to run away?

A: No, he did not.

Q: Well, tell me – tell me what happened next, then.

A: It was at that point that he raised the knife that was previously below his waist up above his waist, probably right above shoulder height, and began to move towards me. I again told him to drop the knife. When I saw that he was advancing towards me, I

3

|   |    |                                                                                                          |
|---|----|----------------------------------------------------------------------------------------------------------|
| 1 |    | knew that my life was in jeopardy. I knew that I had allowed him to get too close to me, |
| 2 |    | and I fired three rounds from the department-issued handgun. |
| 3 |    | . . . |
| 4 | Q: | Now, referring to page 29 of the – of the transcribed recorded interview, is it true that |
| 5 |    | you had indicated that about – that the half a step Chris Burgess took was primarily |
| 6 |    | through his upper body?[1] |
| 7 |    | . . . |
| 8 | A: | And I guess to answer that question, it would be true that that was part of what I said in |
| 9 |    | that statement. I said that he didn't take two steps. |
| 10 |   | I would estimate that he took a half step to one step, movement towards me, and that it |
| 11 |   | seemed to me that it was primarily with his upper body, but that my attention was |
| 12 |   | focused primarily on the weapon. |
| 13 | Q: | And was that – was it true that your – that your attention was focused primarily on your |
| 14 |   | weapon? |
| 15 | A: | No. My attention was focused primarily on the knife or the weapon that he was holding |
| 16 |   | in his right hand. |
| 17 | Q: | So the weapon that you're referring to in your recorded statement is – is – is Chris |
| 18 |   | Burgess's weapon and not your Glock .40? |
| 19 | A: | Yes, that is correct. |
| 20 | Q: | And what did you mean when you said that it was primarily through his upper body? |
| 21 | A: | Well, I think that his – he – I saw that he was moving towards me, but my attention was |
| 22 |   | focused primarily on the knife and how it had moved from his lower body to the upper |
| 23 |   | part of his body in an offensive maneuver, and I saw him moving towards me. |

---

[1] On page 29 of Liles' transcribed recorded interview, Liles was asked ". . . do you recall how many steps he took toward you?" Liles answered, ". . . I, I can't tell ya . . . how many steps he took. I don't think he took two. . . I . . . he didn't take two. I would estimate he took, uh, a half step to one step. His movement was towards me. . . that was indicated primarily with his upper body. . . and uh. . . believe. . . . – but again, my attention was focused primarily on my weapon." Liles Decl. Ex. A (ellipses in transcript).

4

| | | |
|---|---|---|
| Q: | And what do you mean by an "offensive manner?"[2] | |
| A: | Well, the knife was being held below his waist when I first contacted him. | |
| | After issuing him the commands to drop the knife, he raised the knife up so that it was up probably in line with his right shoulder or right side of his chest in an offensive manner, "offensive" meaning he was – and my impression of that was he was going to bring it towards me to stab with it. | |
| Q: | Was he pointing the blade at you? | |
| A: | Yes, he was. | |
| Q: | All right. And was there a hole that he ended up falling into? | |
| A: | There was a hole in the ground that he did fall into after he was shot. | |
| Q: | All right, and was this hole to the right of Mr. Burgess or to the left of Mr. Burgess? | |
| A: | To the left. | |
| Q: | The left. And can you – can you give us an estimate of about how many feet to the left of Mr. Burgess's left foot this hole would have been? | |
| A: | My estimate would be probably one to two feet. Not greater. | |
| . . . | | |
| Q: | Did – did Mr. Burgess fall into the left hole at any point in time prior to you shooting him? | |
| A: | No. | |

Delaney Reply Decl. Ex. A (Liles Depo. at 43:10-64:12).

On August 22, 2008, this lawsuit was filed by Christopher Burgess' mother, Marjorie Burgess. The first amended complaint alleges the following claims: (1) violation of the Fourth Amendment, unreasonable search and seizure, pursuant to 42 U.S.C. § 1983, (2) *Monell* claim pursuant to 42 U.S.C. § 1983, (3) deprivation of familial relationship in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, and (4) conspiracy to deprive the decedent of Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983. In the course of briefing the instant motion, plaintiff has agreed

---

[2] The transcript states both "maneuver" and "manner."

5

*(Left margin: **United States District Court** / For the Northern District of California)*

to stipulate to dismissal of the claims for false arrest, excessive force by defendant Schaening, and municipal liability. *See* Opp'n at 16. The only claim addressed in plaintiff's opposition to the motion for summary judgment is the claim for excessive force against defendant Liles.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id*. The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Defendants contend that summary judgment is appropriate because Officer Liles' use of deadly force was reasonable under the circumstances. Plaintiff argues that summary judgment should be denied because a reasonable juror could draw inferences from the facts to conclude that Burgess was attempting to surrender at the time he was shot, and thus that Liles' use of deadly force was unreasonable. Plaintiff makes the following six assertions: (1) Liles' statement that Burgess' movement was primarily an "upper body movement" is consistent with Burgess attempting to toss the knife and surrender; (2) the location of the knife, which was found one to two feet to the left of Burgess' left leg in a hole, is consistent with Burgess having tossed the knife across his body in an effort to surrender; (3) Liles was unable to see Burgess' feet when he pulled the trigger, which belies Liles' claim that Burgess was advancing on Liles when Burgess was shot; (4) Burgess had already discarded the knife at the time he was shot, as Liles testified that he was unable to see the knife in Burgess' hand at the time he fired his weapon; (5) the autopsy report notes a "steep angle" for the bullet trajectory of the entry wound for Burgess' thigh, evidencing that Burgess was complying with Liles' commands to drop the weapon by bending over or stooping to toss the knife; and (6) Burgess' last words were "I don't want to die," reflecting the mind of a person who wants to live, and not someone who would charge at an officer with a knife when the officer was pointing a gun at his chest at close range. Opp'n at 8:14-9:4.

Defendants argue, and the Court agrees, that none of the inferences asserted by plaintiff are reasonably supported by the evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also McLaughlin v. Liu*, 849 F.2d 1205, 1208-09 (9th Cir. 1988) ("[A]n inference as to another material fact may be drawn in favor of the nonmoving party only if it is 'rational' or 'reasonable' and otherwise permissible under the governing substantive law.").

Plaintiff first asserts that Liles' statement that Burgess' movement was primarily an "upper body movement" is consistent with Burgess attempting to toss the knife and surrender. In fact, Liles testified that he observed Burgess step towards him after he repeatedly warned Burgess to drop the knife while he had his service weapon drawn and pointed at Burgess. Delaney Reply Decl. Ex A (Liles Depo. at

65:15-23). Liles testified that he saw Burgess raise the blade of the knife from his waist to his chest area, point the blade at Liles, and move toward Liles in an offensive manner. *Id*. at 62:17-63:9, 79:11-21. Liles described Burgess' movement as primarily an "upper body movement" based on the fact that he was focused on the knife in Burgess' hand at the time that he advanced toward Liles. *Id*. at 44:8-18, 61:18-62:23. There is no evidence refuting Liles' testimony that Burgess raised the knife in an offensive manner. Nor is there any evidence suggesting that Burgess ever attempted to drop the knife or otherwise comply with Liles' warnings. Liles' description of Burgess' movement as an "upper body movement" does not reasonably support the inference that Burgess was attempting to toss the knife and surrender.

Second, plaintiff argues that the location of the knife, which was found one to two feet to the left of Burgess' left leg in a 15 inch deep hole, is consistent with Burgess having tossed the knife across his body in an effort to surrender. Liles testified that when he was shot, Burgess stumbled to the left and his left leg fell into the hole. *Id*. at 63:10-64:18, 69:9-24, 73:19-75:25. Liles also testified that when he began firing, he observed that Burgess was holding the knife in his right hand with the blade pointed at Liles. *Id*. at 62:17-63:9, 79:11-21. Liles testified that although he was unable to see when Burgess dropped the knife, he concluded that Burgess dropped the knife sometime after he was shot. *Id*.; *see also id*. at 69:9-71:25, 72:9-73:4. Liles' testimony directly refutes plaintiff's assertion, which is unsupported by any evidence, that Burgess was attempting to toss the knife and surrender, and any inferences to the contrary are not reasonable.

Third, plaintiff contends that Liles' inability to see Burgess' feet when he pulled the trigger belies Liles' claim that Burgess was advancing on Liles when Burgess was shot. However, in the deposition testimony cited by plaintiff, Liles testified:

Q: Now, at the moment you – you – you – you – pull the trigger on your Glock .40, were you able to see whether Chris Burgess's feet were actually moving forward?

A: I think you're trying to get specific as to if I saw his feet moving forward. Is that correct?

Q: Right. As opposed to his right arm moving in an upward manner.

A: No. I – I can't tell you that I saw his feet themselves moving. What I can tell you is that I saw his right arm come up to about shoulder level with the knife and I saw him moving

8

towards me, and that I think he took probably a half a step towards me from five feet away, approximately.

Galipo Decl. Ex. D (Liles Depo. at 88:2-15). Throughout his deposition Liles consistently testified that Burgess advanced toward him while brandishing the knife. *See* Delaney Reply Decl. Ex. A (Liles Depo. at 65:15-23, 69:3-8). The fact that Liles did not see Burgess' feet at the precise moment that he fired the shots does not support the inference, which is directly refuted by Liles' testimony, that Burgess was not advancing toward Liles at the time when he was shot.

Fourth, plaintiff asserts that Burgess had already discarded the knife at the time he was shot, based on Liles' testimony that he was unable to see the knife in Burgess' hand at the time he fired his weapon. As with the other inferences advanced by plaintiff, this inference is not supported by the evidence. Liles testified that he saw the knife in Burgess' hand when he first began to discharge his weapon. *Id*. at 71:7-15 ("he had the knife up in an offensive manner as I was pulling the trigger"), 79:11-15 ("At what angle was Chris Burgess's right arm relative to his chest at the moment that you shot him?" "His – okay. His right arm was – his right hand was holding the knife. The knife was pointed towards me."). Liles testified that it was only after he began firing that he was unable to track the knife and that he did not know exactly when Burgess dropped it. *Id*. at 77:4-23.

Fifth, plaintiff contends that the autopsy report and the declaration of forensic pathologist Susan Comfort support the theory that Burgess was complying with Liles' command to drop the weapon. Dr. Comfort, who prepared the autopsy report, states that Burgess sustained two gunshot wounds, one to the chest and one to the left thigh. Comfort Decl. ¶ 2.[3] Plaintiff emphasizes Comfort's statement that,

> The trajectory of the bullet wound to the deceased's left thigh was at an upward steep angle from right to left. The deceased was 5'10". Assuming that the police officer who shot the deceased was also 5'10"[4] and standing in an upright position at the moment he pulled the trigger, the deceased was most likely in a kneeling, crouching, or laying position on the ground at the moment he was shot in the left thigh. If the deceased was in a kneeling or crouching position at the moment he was shot in the left thigh, it was most likely that he was falling backward. The trajectory of the bullet wound to the left thigh is not consistent with the deceased standing in an upright position.

---

[3] Dr. Comfort's declaration states that the autopsy report is attached to her declaration. However, the declaration filed with the Court does not contain any such report. *See* Docket No. 63.

[4] The parties agree that both Burgess and Liles were 5'10".

9

1   Comfort Decl. ¶ 3. Plaintiff argues that Dr. Comfort's declaration is evidence that Burgess could not
2   have been standing and advancing toward Liles when Liles fired upon him. However, Liles testified
3   that during the shooting, Burgess stumbled and fell to his left, and that his left leg partially fell into a
4   hole. Delaney Reply Decl. Ex. A (Liles Depo. at 73:23-74:3) ". . . the young man is in a fluid movement
5   from where he goes from a standing position, slips down into a hole after being shot and stumbling to
6   the left, and has part of his leg resting in this hole. And then – I mean, you've got high points and low
7   points from where he's standing to kneeling . . . ."). Dr. Comfort also states that the trajectory of the
8   bullet wound to the chest was "slightly downward." Comfort Decl. ¶ 3. Dr. Comfort's statements are
9   consistent with Liles' testimony that he believes he was "a little bit higher than" Burgess when he shot
10  him because "[t]here is a slight grade in the hill where I was above and he was below." Galipo Decl.
11  Ex. D (Liles Depo. at 80:21-81:1). In the face of this undisputed testimony, the inference that plaintiff
12  advances – that Burgess was first shot in the leg while he was kneeling to surrender, then stood up and
13  was shot in the chest – is unreasonable.

14  Finally, plaintiff asserts that Burgess' last words – "I don't want to die" – reflect the state of
15  mind of someone who wanted to live and who therefore was surrendering. However, Liles testified that
16  Burgess made this statement prior to passing away. Delaney Reply Decl. Ex. A (Liles Depo. at 77:24-
17  78:2). The Court agrees with defendants that this statement is indicative of a person who does not want
18  to die from the gunshot wounds he just sustained, and that in face of the undisputed evidence, it is
19  unreasonable to infer from this statement that Burgess was complying with Liles' commands and
20  surrendering.

21  The Court concludes that summary judgment in favor of defendants is warranted. The use of
22  "deadly force" is only justified where the officer "has probable cause to believe that the suspect poses
23  a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*,
24  471 U.S. at 3. Under this test, an officer is justified in using deadly force where a suspect threatens him
25  with a weapon such as a gun or a knife. *See Haugen v. Brosseau*, 351 F.3d 372, 381 (9th Cir. 2003)
26  (citing cases), *rev'd on other grounds*, 543 U.S. 194 (2004).

27  Here, the undisputed evidence shows that Liles was in close range to Burgess when Burgess
28  raised his knife, pointed the blade at Liles, and moved toward Liles in an offensive manner. Liles


testified that he was in an enclosed area, with vegetation all around him and Burgess facing him. Burgess had evaded arrest, and ignored Liles' repeated commands to drop the knife and surrender. Thus, Burgess' conduct posed an imminent threat to Liles' safety, and the use of deadly force was justified. *See, e.g., Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (holding that deadly force was justified where a suspect violently resisted arrest, physically attacked the officer, and grabbed the officer's gun); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding that deadly force was reasonable where a suspect, who had been behaving erratically, swung a knife at the officer). The principal case relied on by plaintiff, *Espinosa v. City and County of San Francisco*, 598 F.3d 528, (9th Cir. 2010), is distinguishable. *See id.* at 538 (affirming denial of qualified immunity where there were numerous disputes of fact, and where unarmed decedent was shot 25 times at close range, had not been accused of any crime, could not escape, and "had not brandished a weapon, spoken of a weapon, or threatened to use a weapon").

Plaintiff also asserts that Liles acted unreasonably by pursuing Burgess because "Officer Liles readily admits that there were no other civilians in the area to which Chris could have posed a threat." Opp'n at 10:5-6. However, Liles testified that he did not consider waiting for backup to arrive and setting up a perimeter, as opposed to pursuing Burgess, because he did not know Burgess' location and "[w]ith the grade school children that were getting out of school just up the road, I couldn't let him run and basically get free, because there was no perimeter to set up at that point." Delaney Reply Decl. Ex. A (Liles Depo. at 31:19-32:8). Liles' conduct was reasonable under these circumstances.

For the foregoing reasons, the Court concludes that defendant Liles' use of deadly force was reasonable under the circumstances, and GRANTS defendants' motion for summary judgment.[5]

---

[5] The first amended complaint also alleges a Fourteenth Amendment claim on behalf of the decedent's mother for interference with familial relations. It is unclear from the briefing whether plaintiff has also abandoned that claim. In any event, in order for plaintiff to state such a claim, the officer's conduct in killing the decedent must shock the conscience. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Where the situation allows for deliberation, a plaintiff must show deliberate indifference on the part of the defendant in order to demonstrate conscience shocking behavior. *See id.* at 853. When government actors must act quickly without the benefit of reflection, a plaintiff must show that the defendant acted with "purpose to cause harm unrelated to the legitimate object of arrest" in order to establish behavior that shocks the conscience. *See id.* at 836. Here, for all of the reasons stated in this order, the undisputed evidence shows that Officer Liles acted reasonably, and thus as a matter of law, his conduct did not shock the conscience.

11

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS defendants' motion for summary judgment. (Docket No. 53).

**IT IS SO ORDERED.**

Dated: January 10, 2011

SUSAN ILLSTON
United States District Judge